ROHN HEBEL, Plaintiff-Appellant, *v.* SHERMAN EQUIPMENT, Defendant-Appellee.

First District (4th Division) No. 80-1871

Opinion filed October 8, 1981.

JIGANTI, J., dissenting.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (James W. Ford, of counsel), for appellant.

Wildman, Harrold, Allen & Dixon, of Chicago (Howard T. Brinton, William J. Rogers, and Ruth E. Van Demark, of counsel), for appellee.

Mr. JUSTICE LINN delivered the opinion of the court:

Plaintiff, Rohn Hebel, appeals from an order of the circuit court of Cook County granting summary judgment in favor of defendant, Sherman Equipment.[1] Plaintiff's strict liability action seeks damages for an injury allegedly caused by a defective conveyor drive chain mechanism which admittedly defendant did not manufacture or sell. On appeal, plaintiff contends that a material question of fact exists as to whether defendant held itself out to be the manufacturer of the conveyor drive chain mechanism and therefore can be held strictly liable as the apparent manufacturer of the conveyor mechanism.

We reverse and remand. The pertinent facts follow.

Plaintiff's amended complaint filed on July 31, 1978, alleges that on February 22, 1976, plaintiff, who was then 16 years old, was employed by the Glenbrook Standard Station and Car Wash (Glenbrook). His employment necessitated working "on or about" the automatic car washing machinery. This machinery, the amended complaint charged, was designed, manufactured and sold by defendant in a defective and unreasonably dangerous condition in that there was a hole in the cover of the conveyor drive chain mechanism. Although the hole was uncovered, the machinery remained operating. Plaintiff's foot "slipped" into the hole and was "caught in and mangled by the moving drive chain mechanism."

Defendant's answer, filed on September 11, 1978, admitted that it designed and manufactured "certain portions" of the automatic car washing machine for Glenbrook and sold those "certain portions" to

[1] Plaintiff sued defendant as "Sherman Equipment." Defendant's true name is Sherman Industries, Inc. Prior to 1976, Sherman Industries, Inc., was known as the Sherman Car Wash Equipment Company. Sherman Industries, Inc., is owned by Sherman Supersonic Industries. Defendant's affiants made no distinction between the companies when discussing the sale of car washing equipment and they refer to "Sherman," "Sherman Industries Inc.," "Sherman Equipment," and "Sherman Car Wash Equipment Company" interchangeably.

Glenbrook. Defendant's answer denied that the machine and its component parts left defendant's control in a defective and unreasonably dangerous condition because of the hole in the cover of the conveyor drive chain mechanism.

On December 5, 1978, defendant filed its motion for summary judgment and attached the affidavit of John H. Thacher, Jr., the president of Sherman Industries, Inc. Thacher stated that his review of all invoices, purchase orders, bills of lading, and sales memoranda for sale of car washing equipment to Glenbrook disclosed that Sherman never sold a conveyor or any conveyor parts to the Glenbrook station. The trial court denied defendant's motion.

On July 10, 1979, defendant again moved for summary judgment. In this motion, defendant identified the Flapan Car Wash Equipment Company (Flapan) as the manufacturer and seller of the conveyor drive chain mechanism which allegedly caused plaintiff's injuries because of faulty design and manufacture. The affidavits of Seymour Motel, an employee of Flapan, and J. L. Bates, the western regional manager for Sherman Industries, Inc., were attached. Motel asserted that Flapan, and not Sherman, had designed, manufactured, and sold a conveyor drive chain mechanism to Glenbrook for its automatic car washing machine. Bates stated that he examined the automatic car washing machine on April 10, 1979, and he asserted that defendant did not design, manufacture, or sell the conveyor drive chain mechanism for the automatic car washing machine at Glenbrook.

On February 11, 1980, plaintiff filed a response to defendant's motion asserting that defendant had held itself out to be the manufacturer of the conveyor drive chain mechanism. Attached as exhibits to plaintiff's response were excerpts from the depositions of Thacher and Motel, several promotion flyers and the Haverberg-Glenbrook contract for the sale and installation of automatic car washing equipment at Glenbrook. Defendant's reply incorporated other excerpts of the same depositions.

In his deposition, Thacher stated that prior to July 1, 1976, Sherman Industries' official name was Sherman Car Wash Equipment Company. Sherman Industries, which owns three local car wash companies, is owned by Sherman Supersonic Industries. Sherman Supersonic Industries also owns the stock of Smith-Thacher, an "affiliated distributorship" of Sherman products in Eastern Pennsylvania, Central New Jersey, and Delaware. Sherman Supersonic Industries does not own the stock of any of the other distributors of its products. Thacher identified Flapan Car Wash Equipment and Haverberg Auto Laundry (Haverberg) as "authorized distributors" of Sherman Supersonic Industries, although he denied that Sherman Industries or Sherman Supersonic Industries had any "legal relationship" with either Flapan or Haverberg.

Thacher also identified several purchase invoices sent by Haverberg to Sherman Car Wash Equipment Company (now called Sherman Industries) for the car washing equipment which was installed at Glenbrook. The Sherman equipment was sold to Haverberg and shipped to Glenbrook. Thacher asserted that, although he had not personally examined the equipment at Glenbrook, Sherman Industries did not manufacture or sell the conveyor drive chain mechanism portion of the car washing machinery installed at Glenbrook. Thacher based this conclusion on the statement of Motel and Flapan that there never was a Sherman conveyor at that site. Thacher explained that "once in a while," Sherman Industries manufactures a conveyor drive chain mechanism which can be used in a Sherman automatic car washing system.

After examining his records, Thacher stated that Sherman Industries did not ship a conveyor drive chain mechanism to Glenbrook, although they did ship other automatic car washing equipment to Glenbrook. Thacher further claimed that he did not know who designed the conveyor drive chain mechanism which was installed at Glenbrook. He thought that the conveyor drive chain mechanism was manufactured for Flapan by another company and that Flapan or Haverberg sold, installed, and serviced the conveyor drive chain mechanism.

Thacher also described how Sherman products were marketed prior to 1976: "their biggest advertisement is the work of our distributors * * *. We sold through distributors." Thacher acknowledged that when a Sherman car washing machine system is installed, the Sherman name is displayed on the front of the machinery. Some equipment castings also have the Sherman name embossed on them. He also noted that a Sherman brochure showed the Sherman name on the front of the automatic car washing unit. He did not describe whether the Sherman name appeared as "Sherman" or "Sherman Industries" or "Sherman Supersonic Systems."

Seymour Motel, the Flapan employee, asserted that the Flapan name was a "trade name" and Haverberg was the "corporate name" of the same corporate entity. He described Haverberg as a sales, service and manufacturing company for the car wash industry. Motel also stated that the sale of a conveyor drive chain mechanism together with the Sherman equipment which his company (Flapan-Haverberg) distributed, would comprise everything necessary for a "tunnel type" of car wash. Motel explained that Sherman Industries orders conveyor drive chain mechanisms from either Flapan or Haverberg and Flapan or Haverberg then ships the conveyor drive chain mechanism to the "end user" and bills Sherman Industries for payment. This method of doing business has been going on for 10 to 12 years.

Motel further stated that the conveyor drive chain mechanism sold to Glenbrook was designed by an employee of Flapan or Haverberg.

Haverberg directly sold the conveyor to Glenbrook; Sherman Industries did not manufacture any portion of the conveyor installed at Glenbrook. Motel also identified a document, the "Sherman equipment purchase order," which was used to order automatic car washing equipment from Sherman for installation at Glenbrook. He acknowledged that this order form was labelled at the top as follows: "Sherman Supersonic Systems Interdepartmental Equipment Order." Motel also identified the sales contract entered into by Haverberg Auto Laundry Equipment Company and Glenbrook. The contract listed various car washing equipment items which were sold to Glenbrook. One of the items, a "Sherman-Haverberg wheel washer," was manufactured solely by Haverberg. Sherman did not manufacture any part of it.

Motel further stated that the conveyor drive chain mechanism which was installed at Glenbrook contained no name plate or serial number; the name "Flapan" or "Haverberg" did not appear anywhere on the conveyor drive chain mechanism. Motel also acknowledged that when a salesperson from his company discussed a car washing system with a potential buyer, he provided expert advice on what type of system would be best to use.

The Haverberg-Glenbrook contract lists 12 pieces of car washing equipment. "Sherman" alone is named as the type of equipment for nine of the pieces (*e.g.*, "Sherman Glo-wax"); Sherman and Haverberg are named together on one of the pieces (*e.g.*, "SHERMAN-HAVERBERG"), and Haverberg alone is named on a type of conveyor drive chain mechanism (*e.g.*, "Haverberg 80 hookless demand"). Haverberg installed all of the equipment. The invoices of the "Sherman Car Wash Equipment Company," listing some of the equipment identified in the contract, bear the heading of "Sherman Supersonic Systems." The various items were sold to Haverberg and shipped to Glenbrook.

The Sherman Car Wash Equipment Company promotional literature pictures an automatic car washing system which has on the front of the system the logo, "Sherman Supersonic Systems." Two additional promotional flyers of Sherman Supersonic Industries, Inc., each describing a different type of car washing system, have pictures of the car washing systems which both bear the logo "Sherman Supersonic Systems" on their front top panels. The promotional flyers describing the two different types of conveyor drive chain mechanisms have the name "Haverberg" on one side of the flyer and, on the other side, the flyers have both Sherman's name and Haverberg's name as follows:

"Sherman

Haverberg Auto Laundry Equipment Company, Inc."

After reviewing these exhibits, the trial court granted defendant's summary judgment motion. Plaintiff's motion for rehearing also was

granted and the trial court, after further hearing, again entered summary judgment for defendant. Plaintiff appeals, contending summary judgment was improperly granted.

Opinion

Plaintiff contends that a genuine issue of material fact exists as to whether defendant may be held strictly liable in tort because it held itself out as the apparent manufacturer of the allegedly defective conveyor belt, and that therefore the trial court erred in determining the issue as a matter of law. We agree.

■■ Summary judgment proceedings test for the existence of any genuine triable issue of fact. (*Clausen v. Ed Fanning Chevrolet, Inc.* (1972), 8 Ill. App. 3d 1053, 291 N.E.2d 202.) The right of the movant to summary judgment, however, must be free from doubt, and the affidavit and attachments supporting the motion should be construed strictly against the moving party and liberally in favor of the opponent, and must leave no question as to the movant's right to judgment. (*Doran v. Pullman Standard Car Manufacturing Co.* (1977), 45 Ill. App. 3d 981, 360 N.E.2d 440.) The purpose of summary judgment is not to try an issue of fact and, although inferences may be drawn from undisputed facts, the motion should not be granted unless those facts are susceptible of but a single inference. (*Doran v. Pullman Standard Car Manufacturing Co.*; *Stanfield v. Medalist Industries, Inc.* (1975), 34 Ill. App. 3d 635, 340 N.E.2d 276.) If reasonable persons could draw different inferences from the facts adduced, a triable issue exists.

Plaintiff's contention that defendant held itself out as the manufacturer of the conveyor drive chain mechanism is based on two factors: first, that defendant allowed its name to be used on literature and materials promoting the conveyor drive chain mechanism actually manufactured by Flapan; and second, that a reasonable person viewing the automatic car washing system bearing defendant's name would perceive it as one machine such that the unlabeled conveyer drive chain mechanism would be considered a component part of the whole system. Defendant maintains that since it did not participate in the actual manufacture or distribution of the conveyor drive chain mechanism, then as a matter of law, it cannot be held strictly liable in tort if the conveyor drive mechanism was defective and caused the injury.

■■ In *Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, 389 N.E.2d 155, our supreme court considered and rejected defendant's contention that such participation is an essential element for the imposition of strict liability. The court reasoned that the societal purposes underlying *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, 210 N.E.2d 182, mandate that the strict liability doctrine be applicable to one who, for a consideration, authorizes

the use of his trademark, "particularly when, * * *, the product bears no indication that it was manufactured by any other entity." (75 Ill. 2d 393, 411, 389 N.E.2d 155, 163.) In considering whether the doctrine of strict liability was applicable to the defendant on the basis that the allegedly defective product bore its trademark, the court cited the *Suvada* court's reliance on *Lill v. Murphy Door Bed Co.* (1937), 290 Ill. App. 328, 8 N.E.2d 714. In *Lill*, an allegedly defective bed bore the Murphy name and label although it was actually manufactured by the Simmons Bed Company. The Murphy Company sold the bed to owners of buildings. Literature issued by the Murphy Company described the bed as sturdy and referred to "the makers" of the bed offering "more" than a bed. There was no evidence that the Murphy Company received consideration from the Simmons Bed Company for the use of its name. The court nevertheless held there was no difference between the liability of a manufacturer and the liability of one who holds himself out to be the apparent manufacturer.

■■ In the instant case, Flapan and Haverberg distributed defendant's automatic car washing equipment and prepared promotional flyers bearing defendant's name for two different types of conveyor drive chain mechanisms. The automatic car washing system at Glenbrook bore only defendant's name. In *Sipari v. Villa Olivia Country Club* (1978), 63 Ill. App. 3d 985, 380 N.E.2d 819, this court held that a genuine issue of fact existed as to whether the defendant, who did not manufacture the allegedly defective golf cart but whose logo appeared on the golf cart, sufficiently held itself out as the manufacturer of the golf cart. Similarly, considering the evidence presented here in its aspect most favorable to plaintiff as we are required to do (*Doran*), we believe that reasonable persons could draw different inferences, and therefore, a genuine issue of fact exists as to whether defendant held itself out to be the manufacturer of the conveyor drive chain mechanism. In our view, the trial court erroneously granted summary judgment.

The judgment of the circuit court of Cook County is reversed and the cause is remanded for further proceedings.

Reversed and remanded.

ROMITI, P. J., concurs.

Mr. JUSTICE JIGANTI, dissenting:
The culpability of Sherman eludes me. The pertinent facts are few and rather straightforward. The two facts that led the majority to find that a question of fact is presented centered around two separate factual settings that need some clarification. One concerns Sherman's name

appearing on certain items of equipment that were in the car wash and the other on advertising literature.

Sherman manufactured familiar pieces of equipment that are seen in a car wash. Among those items, for example, were a large inverted "U" shaped car rinser with enormous brushes, a similarly shaped washer and a dryer. On each piece of equipment Sherman manufactured it placed its own name. Sherman sold these individual pieces of equipment through distributors. Sherman in fact sold several pieces of equipment used by the car wash in this case to Haverberg. Haverberg in turn sold the equipment to Glenbrook. Haverberg also provided expertise and installed the equipment at Glenbrook. Sherman of course neither manufactured nor sold the conveyor in which the plaintiff was allegedly injured. Haverberg manufactured the conveyor itself. There was no designation on the conveyor identifying Sherman. It was on this conveyor that the plaintiff was allegedly injured while working at Glenbrook.

I believe some comment should be made on the statement of facts in the majority opinion. I believe that they lead to a mistaken impression. The majority states that Haverberg sold "a Sherman car washing system." Sherman did not sell a car washing "system." Haverberg may have sold Glenbrook a system which included not only certain items manufactured by Sherman but also included items manufactured by Haverberg. Sherman only sold *individual pieces* of equipment that it manufactured. The opinion quotes Thacher as saying that when a Sherman car washing machine *system* is installed, the Sherman name is displayed on the front of the machinery. Thacher said that the name was an integral part of each piece of equipment and is not a separate sign. The opinion points out that the contract between Haverberg and Glenbrook, which of course Sherman was not a party to, states that Sherman and Haverberg are named together on one of the items sold as "Sherman-Haverberg." The contract did indeed identify a wheel washer as being a "Sherman-Haverberg" wheel washer. The contract is not in fact correct. That piece of equipment was manufactured by Haverberg and has nothing to do with Sherman.

The only other alleged involvement of Sherman in this transaction results from the advertisements. There are not one but two separate sets of advertisements with two different authors. Sherman issued common advertisements for the products it sells and in fact did sell to Haverberg, that is, the rinser, the washer and the dryer. The advertisements contained pictures and rather precise details of the equipment such as its exact size, electrical and plumbing equipment and other facts. That would be helpful to a prospective purchaser. There was no literature concerning a conveyor belt.

The allegedly inculpatory literature was issued by Haverberg. It consists of a single sheet of very colorful red and white paper that

unfortunately would not take to reprinting with the issuance of this opinion. On the front side at the top prominently displayed in black letters is "Jack Flapan's Haverberg Equipment Company." The name "Haverberg" is on a separate line and is in print larger than the other wording. Also on the front side is a picture of a conveyor belt with no designation on the conveyor belt as to its manufacturer. There is nothing on the front side that identifies Sherman. On the back are the same pictures that are on the front and text extolling the virtues of the conveyor belt. At the very bottom of the page is the single word Sherman, as is indicated in the majority opinion, followed on the next line by the words Haverberg Auto Laundry Equipment Company, Inc., along with Haverberg's address and telephone number.

Reduced to its essentials Sherman manufactured individual pieces of equipment that could be used in a car wash. On each piece of equipment that it manufactured it placed its own name. The majority holds that Sherman was wrong in placing its name on the individual items of equipment that it manufactured. I fail to see what Sherman should have done. I do not believe that it can be said that Sherman should not put its own name on its own equipment. Nor do I believe that if Sherman wanted to place its own name on its own equipment it should have issued some sort of disclaimer along with its name to the effect that although it manufactured the rinser it was not necessarily the manufacturer of any other piece of equipment that a party may see in a car wash.

The majority accepts the contention of the plaintiff that a reasonable person viewing the automatic car washing system would perceive that it was one machine and that the unlabeled conveyor drive chain mechanism would be considered a component part of the system. Neither the plaintiff nor the majority cite any case law to support the legal efficacy of this statement. The apparent rationale is that a plaintiff has a right to rely on his own mistaken impression. None of the cases cited by the plaintiff, which will be discussed momentarily, support this rationale. Under the majority's all encompassing view, if a person were run down by a vehicle on the street due to the vehicle's defective brakes, the manufacturer of the automobile would be responsible even though the car's brakes had been replaced and someone else's braking system was placed in that vehicle. In line with the reasoning in this case the majority apparently holds that even if Sherman had sold the entire system including a conveyor if the conveyor was replaced with another conveyor Sherman would be responsible.

There is more of a duty on a plaintiff to find the proper defendant than to merely glance at something and assume who the defendant should be. As applied to this case the result is particularly inappropriate because the plaintiff knew that he was injured on the conveyor. The conveyor of

course did not bear the name of Sherman because it was manufactured by Haverberg. The plaintiff's remedy was to investigate and to discover the proper defendant. I do not believe that the plaintiff has a right to make Sherman financially responsible because of the plaintiff's unwarranted assumptions.

I see no legal significance in the brochure that was issued by Haverberg and which contained the name Sherman on the back page. The plaintiff did not see the advertisement. Sherman did not authorize the advertisement. Sherman did nothing to induce anyone to buy a conveyor that it did not even manufacture. The majority opinion makes a manufacturer responsible for every product the distributor sells simply because the distributor advertises that it distributes for a particular manufacturer.

The case law provides no support to the plaintiff. Cited are four cases that are patent examples of holding out: *Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, 389 N.E.2d 155; *Sipari v. Villa Olivia Country Club* (1978), 63 Ill. App. 3d 985; *Lill v. Murphy Door Bed Co.* (1937), 290 Ill. App. 328, 8 N.E.2d 714, and *Davidson v. Montgomery Ward & Co.* (1912), 171 Ill. App. 355. In each of them the defendant permitted its name to be placed on the product that caused the injury. Implicit in the holding out doctrine is the notion that the defendant has done something to give the plaintiff the erroneous impression that the product which injured him was manufactured by the defendant. More specifically it has been held that a party who leads others to believe that he is the manufacturer by placing his name on a product, label, by advertising or by other means may be held to the same liability for the defective product as if he were actually the manufacturer. He is effectively estopped from denying his identity as the manufacturer. Annot., 51 A.L.R.3d 1344, 1361 (1973).

In the instant case Sherman did not do anything to create the impression in the mind of the plaintiff that it had manufactured the conveyor. The plaintiff in the instant case worked at the gas station where he was injured and was obviously familiar with the machinery. The complaint alleged that he was injured by the conveyor drive chain mechanism belt which had a hole in its cover. The plaintiff could readily see that the defendant's name or trade mark did not appear on this particular piece of machinery. Thus, the plaintiff could not have been misled into thinking that the defective conveyor was manufactured by the defendant.

In *Connelly*, the court in ruling on a case involving a licensor that allowed a product to be manufactured with the licensor's name on it set out the policy rationale for applying the holding out doctrine:

> "A licensor is an integral part of the marketing enterprise, and its participation in the profits reaped by placing a defective product in the stream of commerce [citation] presents the same public policy reasons for the applicability of strict liability which sup-

ported the imposition of such liability on wholesalers, retailers and lessors. The societal purposes underlying *Suvada* mandate that the doctrine be applicable to one who, for a consideration, authorizes the use of his trademark, particularly when, as here, the product bears no indication that it was manufactured by any other entity."

Sherman did not reap any profits and did not place the conveyor into the stream of commerce.

For the reasons stated I would affirm the judgment of the trial court.